UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES             )

                                       )     Case No. 07 CR 556

       v.                )

                                       )     Judge Joan B. Gottschall

BRIAN BURNS             )

## MEMORANDUM OPINION & ORDER

A jury convicted Brian Burns of two violations of 18 U.S.C. § 2252A(a)(2)(A) for receiving and distributing child pornography. The court heard witnesses and victim impact testimony relevant to sentencing on August 3, 2009; the parties presented further testimony to the court at a hearing held August 14, 2009. The court heard arguments and Burns's allocution at the sentencing hearing held on October 16, 2009.

This order determines Burns's applicable sentencing range under the Federal Sentencing Guidelines (the "Guidelines"), and then considers the factors listed in 18 U.S.C. § 3553(a),[1]

---

[1] 18 U.S.C. § 3553(a) specifies the following factors to be considered:

    **(1)**      the nature and circumstances of the offense and the history and characteristics of the defendant;

    **(2)**      the need for the sentence imposed –
            **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
            **(B)** to afford adequate deterrence to criminal conduct;
            **(C)** to protect the public from further crimes of the defendant; and
            **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    **(3)**      the kinds of sentences available;

    **(4)**      the kinds of sentence and the sentencing range established [in the Federal Sentencing Guidelines];

    **(5)**      any pertinent policy statement [issued by the Sentencing Commission];

    **(6)**      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    **(7)**      the need to provide restitution to any victims of the offense.

including the seriousness of the offense, the characteristics of the defendant and, correspondingly, what punishment is just. § 3553(a)(2)(A).

## I. <u>Background</u>

The investigation that led to Burns's indictment began when M, a then sixteen year-old female, mentioned to her therapist that she and Burns had been engaged in a sexual relationship for several months. On June 23, 2006, Evanston, Illinois police officers executed a search warrant at Burns's residence and seized his computer. Pursuant to a subsequent warrant, police searched the contents of Burns's computer, found evidence of child pornography, and stopped the search to obtain a further warrant. This third warrant supported the search of Burns's computer for the images that he was eventually tried for and convicted of possessing and distributing. Additionally, the searches uncovered evidence that Burns had been sexually active with A, a woman who was sixteen when their sexual relationship began. Burns's longest relationship, lasting from 1998-2002, was with Kathryn, who was either sixteen or seventeen when they began dating; Burns was twenty or twenty-one. Kathryn's mother wrote to the court saying that she knew of and approved of the relationship and "learned to love [Burns] like a son" while Burns and her daughter were together.

## II. <u>Analysis</u>

Although district courts are not to apply "any thumb on the scale favoring a [Federal] Sentencing Guideline sentence," a court is still "ordinarily obliged to first consider the presentence report and its calculation of the Guidelines and then consider the respective parties' arguments as to whether the Guidelines sentence should apply." *United States v. Allday*, 542 F.3d 571, 572–73 (7th Cir. 2008) (quotation omitted). Burns objects to the inadequacy of the Presentence

---

18 U.S.C. § 3553(a).

Investigation Report's ("PSR"'s ) documentation of his mental health history, to the propriety of a five-point offense level enhancement for abuse or exploitation of minors, and to the omission of a two-level reduction for acceptance of responsibility under the Guidelines. The government supports the Guidelines calculation in the PSR. The probation office, as it almost invariably does, recommends a guideline sentence.

## A.      Five Point Enhancement Under U.S.S.G. § 2G2.2(b)(5).

Pursuant to § 2G2.2(b)(5) of the Guidelines, the PSR applied a five-point increase in the offense level because the "defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." PSR 4. The PSR goes on to cite the Guidelines' definition of "pattern of . . . exploitation":

> any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct.

U.S.S.G. § 2G2.2, N. 1. Relying on this definition, the PSR applied a five-point increase because Burns engaged in sexual activity with M while she was a minor.

Burns objects to this enhancement, arguing that the Guidelines' definition of "pattern of sexual abuse and exploitation of a minor" is also subject to another definition which does not encompass Burns's conduct. Specifically, the Guidelines define "sexual abuse or exploitation" in a way that limits the universe of relevant acts to those criminalized in a series of federal statutes. *See id.* § 2G2.2, Defs. According to Burns, the only one of those enumerated statutes which could possibly relate to Burns's conduct with M is 18 U.S.C. § 2243, which criminalizes any sexual act between a minor who has "not attained the age of 16 years" and a person who is at least four years

older than the minor. Because M was 16 when she and Burns began their consensual sexual relationship, Burns contends that these acts cannot support the five-point increase applied in the PSR.

For its part, the government argues that the five-point increase is correct because the Guidelines specify that a minor means "an individual who has not yet reached the age of 18." Resp. Br. at 2 (citing U.S.S.G. § 2G2.2 App. Note 1). Accordingly, the government contends Burns's sexual relations with M constitute a "pattern of sexual abuse and exploitation of a minor." In support of this enhancement the Government cites *United States v. Gunderson*, 345 F.3d 471, 472 (7th Cir. 2003), where the Seventh Circuit held that a five-level enhancement under § 2G2.2 was appropriate where the defendant, who was twenty-two at the time, twice had sexual intercourse with his seventeen year-old girlfriend.

*Gunderson* is not dispositive here. As Burns correctly argues, *Gunderson* applied a definition of "sexual abuse and exploitation" which is different from the definition the court is required to apply here, where both parties (and the PSR) agree that the 2008 Guidelines control. *See* U.S.S.G § 1B1.7 (failure to follow Guidelines' commentary could subject a "sentence to possible reversal on appeal"). The former definition (which the *Gunderson* court was bound to apply) provided that sexual abuse and exploitation meant "conduct constituting criminal sexual abuse of a minor, sexual exploitation of a minor, abusive sexual contact of a minor, [and] *any similar offense under state law*." U.S.S.G. § 2G2.2, N. 1 (2003) (emphasis added). Thus, the *Gunderson* defendant's prior misdemeanor conviction under state law for his sexual relationship with his girlfriend was properly found to require a five-point increase under the former Guidelines definitions. *See Gunderson*, 345 F.3d at 473.

The government additionally relies on two cases from other circuits for the general proposition that "conduct of a sexual nature with a 16-year-old qualifies for the enhancement." Resp. 2.  In *United States v. Stacy*, 269 Fed. Appx. 322 (4th Cir. 2008), the defendant conceded one "instance of sexual abuse or exploitation of a minor for sending a pornographic photograph over the Internet to a sixteen year old" toward the § 2G2.2(b)(5) enhancement.  *Id.* at 324.  *Stacy* is inapposite for a number of reasons.  Critically, the concession involved the defendant's *creation* of pornography involving a person under the age of 18, a violation of 18 U.S.C. § 2251(a), one of the statutes upon which a five-point increase may be based.  *See United States v. Stacy*, Br. for Appellant, 2007 WL 2183261, at *13 n. 2 (4th Cir. 2007); § 2G2.2(b)(5).  Further, the Fourth Circuit described the evidence supporting a number of incidents of predatory behavior by the defendant involving minor children, including but not limited to an instant message conversation where Stacy and another individual reached an agreement pursuant to which the other individual would bring his disabled 12-year-old daughter to a restaurant where Stacy could abuse her.  *Stacy* does not support the government's position that any conduct of sexual nature with a sixteen year-old qualifies for the five-point enhancement.

Finally, the government turns to *United States v. Williams*, 183 Fed. Appx. 246, 248 (3d Cir. 2006), contending that the case held "that going to a restaurant with the purpose of meeting a 16-year-old girl to have sex with [her] counted as one instance of sexual conduct with a minor." Resp. 3.  As with *Gunderson*, however, the finding in *Williams* is inapposite because it was based on the  Guidelines from 2003, which define sexual abuse or exploitation much more broadly than the 2008 Guidelines applicable here.  The plain application of the Guidelines, therefore, cannot

support a five-point enhancement based on the sexual relations Burns had with M.[2]

In a supplemental memorandum, the government asserts an alternative basis for the five-level § 2G2.2 enhancement, arguing that Burns violated the "enticement" statute (18 U.S.C. § 2422) incorporated in the definition of "sexual abuse and exploitation" discussed *supra*.  Section 2422 prohibits

> using the mail or any facility or means of interstate or foreign commerce ... to knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ] any individual who has not attained the age of eighteen years, to engage in prostitution or sexual activity for which any person can be charged with a criminal offense, or attempt[ing] to do so.

18 U.S.C. § 2422(b).[3]  The government contends it has met its burden to prove Burns's violation of § 2422 by a preponderance of the evidence because M testified that Burns had numerous inappropriate sexual conversations with her over the Internet using an instant messaging program before she turned sixteen.  The government urges that these conversations "groomed" M for her sexual relationship with Burns and thereby violated the enticement statute.  Additionally, the government points to two letters Burns wrote after his arrest by the Evanston police and mailed to M while she was attending summer camp in Europe, arguing that these letters constitute separate violations of § 2422(b) because the first letter discusses a sexual dream that Burns had about M and suggests that the two meet upon her return to the U.S., and the second letter proposes that he and M meet to shower together when she returns from Greece.

---

[2]  Curiously, the government's briefs do not mention the testimony of M that Burns put his hand up M's shorts, while she was seated on a park bench, to reach into her underwear and grab her buttocks when M was only twelve years old.  According to M she abruptly cut off this unexpected physical contact by standing up and suggesting she, Burns and her sister (who was accompanying them) go for a walk.

[3]  18 U.S.C. § 2422(b) criminalizes enticing a minor to engage in "any sexual activity for which any person can be charged with a criminal offense," and thereby incorporates state law sex offenses.  *Id.*

The government does not point to the specific criminal offense under state law that these letters were intended to entice M to engage in, but M testified that she had sex with Burns on a number of occasions after her return from Greece. Having sex with a person under the age of seventeen is unlawful in Illinois when, as here, the partner in the sexual act is at least five years older than the minor. *See* 720 Ill. Comp. Stat. 5/12-16(d) (2002). For his part, Burns urges that M's testimony on this point is not credible, and he denies any sexual contact with M after his arrest; however, he puts forth no affirmative evidence to contradict M's testimony. And while M's contention that they had sex over eighty times after Burns's arrest is likely exaggerated, it appears equally likely (and credible) that she and Burns had at least a few trysts, particularly absent an evidence-backed disavowal of such conduct from Burns. In any case, whether or not Burns and M had sex after his arrest is beside the point, for the Seventh Circuit has made clear that § 2422(b) criminalizes "persuasion and the attempt to persuade, not the performance of the sexual acts themselves." *United States v. Cochran*, 534 F.3d 631, 634-35 (7th Cir. 2008) (citing *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000)). The question, then, is two-fold: (1) did Burns's sexualized conversations with M over the course of a few years constitute enticement because they "groomed" her for sex; and (2) did Burns entice or intend to entice M by sending letters to her while she was in Europe?

The Seventh Circuit has recognized that "grooming" a minor over a period of time can constitute enticement, but has not clearly articulated what "grooming" is. In *United States v. Gladish*, 536 F.3d 646, 649 (7th Cir. 2008) the panel noted that "child sexual abuse is often effectuated following a period of grooming and the sexualization of the relationship." *Id*. (citing Sana Loue, "Legal and Epidemiological Aspects of Child Maltreatment," 19 J. Legal. Med. 471, 479

(1998)).  Subsequently, *United States v. Zawada*, 552 F.3d 531 (7th Cir. 2008), held that a jury verdict convicting a defendant of attempted enticement was not in plain error where the jury could have viewed the sexual conversations between the defendant and the fictional victim (the defendant was caught in a sting operation) as grooming efforts sufficient to constitute the "substantial step" element of an attempted enticement charge.  *See id*. at 535 ("the jury might have viewed these [sexual] conversations as 'grooming' efforts").

In opposition, Burns reasons that the sexual conversations he engaged in with M when she was thirteen cannot constitute enticement because the conversations he had with M were sporadic, and too much time elapsed between when he ceased having online conversations with M and when they met by happenstance at a Starbucks coffeehouse in Evanston, after which they began a sexual relationship.  Burns cites no case law recognizing such a distinction and the court was unable to locate any.  Additionally, M testified that during her years of sporadic online conversations with Burns, he continually suggested that they meet in person.  Whether or not Burns proposed that he and M engage in sexual acts at those meetings is not specified in the record but is ultimately of little consequence, as M testified that the content of her conversations with Burns was frequently explicit (she referred to them as "cybersex") by the time she was thirteen or fourteen.  According to "grooming" theory, then, flatly proposing sex at such personal encounters would be as consistent with a "grooming" theory of enticement as having coffee because each brings the "groomer" one step closer to his ultimate goal of sexual conquest.  *See* Testimony of Kenneth Lanning,[4] August 14, 2009 at 33, United States v. Brian Burns, No. 07 cr 556 ("A very important part of the grooming process for many offenders is to simply listen . . . offenders will sometimes just nonjudgmentally

---

[4]  The government presented Kenneth Lanning as an expert to educate the court about sex related crimes against children; Mr. Lanning presented no opinion with respect to Burns's specific conduct.

listen to these kids, empathize with them, sympathize with them, talk to them and so on.")

Indeed, the "grooming" theory appears to presume that once a certain level of explicit sexual content enters into the relationship between an adult and a minor, any contact, communication, or kindness offered by the older to the younger must be viewed in the eyes of the law as nothing but a series of small, seductive steps towards the physical consummation of the older person's sexual desires.  Put another way, the grooming theory – particularly here, where it appears Burns provided genuine counsel to M and felt real affection for her – foists a damning teleology on a series of actions each of which might have been motivated by a variety of ends or no ends at all. "Grooming," then, is a powerful lens through which to view human behavior in this kind of case because it radically simplifies the mess of Burns's and M's competing feelings, urges, and needs over the course of their relationship into the neat dichotomy of victim and predator.  The force of this lens is most evident when the government asks the court to view the qualities that led dozens of individuals to write letters testifying to Burns's character as the very "tools the defendant used to accomplish his crimes."  Resp. 11.  Thus, Burns's open ear to M's feelings about her parents' divorce and her father's heavy drinking, as well as his declination to "push" the relationship, *see* Letter to Court from Brian Burns, Supp. Reply Ex. A,  are rendered preliminary acts in the grooming process.  From the court's perspective, meting out just punishment does not require denying the complexity of motive that is an integral part of human dignity.

Ultimately, though, the court need not reach the issue of whether Burns groomed M over the years because the letters Burns sent to M in Europe after he was indicted in Illinois for his sexual relationship with M violate § 2422(b).  A § 2422(b) conviction requires only a finding of an intent to entice "and not an intent to perform the sexual act following the persuasion."  *United States v.*

*Brand*, 467 F.3d 179, 202 (2d Cir. 2006). Thus, the dispute regarding Burns's contact with M after her return from Europe is irrelevant to the enticement analysis. Moreover, Burns also does not dispute that he mailed the letters in interstate commerce to a minor. The only question, then, is whether a preponderance of the evidence supports the inference that Burns intended the letters to entice M to engage in an illegal sexual act.

In the letter dated June 7, 2006 Burns revealed to M a sexual dream about her and then followed up by writing that he expected to see her after her return from Europe. *See* Gov.'s Ex. A. In his July 10, 2006 letter Burns told M: "when you get back we will go to all the good food places and shower together." Gov.'s Ex. to Resp. to Def.'s Supp. Sent. Mem. Both letters, when considered in the context of Burns's relationship with M, support a violation of § 2422(b) by a preponderance of the evidence. In *Gladish*, the Seventh Circuit overturned a conviction for attempted enticement in violation of § 2422(b) by distinguishing the *Gladish* defendant's conduct from the conduct described in *United States v. Goetzke*, 494 F.3d 1231 (9th Cir. 2007). In doing so, the *Gladish* panel made a distinction between the enticement of strangers and the enticement of minors with whom a defendant "had a prior relationship." *See Gladish*, 536 F.3d at 650. With respect to the former, *Gladish* held that explicit sexual talk "does not, by itself, amount to the kind of 'substantial step' needed to prove an attempt violation" of § 2422(b) (*United States v. Davey*, 550 F.3d 653, 654 (7th Cir. 2008) (citing *Gladish*)) because the defendants proposed sexual acts could be erotic puffery or, as the panel put it, "hot air." *Gladish*, 536 F.3d at 650. But as to a minor with whom the alleged enticer had a relationship, there was no similar concern for specificity regarding a physical encounter because sexual talk or compliments "could not be thought idle chatter." *Id.* Here, Burns sent both letters to M after he and M had established a sexual relationship.

In the context of this sexual history it is reasonable to infer that the showering Burns proposed in the second letter was intended as a prelude to some form of proscribed sexual activity. By suggesting that he and M shower together, therefore, Burns intended to entice M to engage in unlawful sexual activity. As for the first letter, sharing a sexual fantasy about M and discussing her sexual appetites (he withheld the details of his dream about M because he "didn't want to get [her] horny" while he was not around) and subsequently stating that he would see her the day she returned home, is also enough to support a violation of the federal enticement statute by a preponderance of the evidence. Consequently, the court finds that the calculation of Burns's offense level under the Guidelines requires application of the five-point enhancement set out in § 2G2.2(b)(5).

### B.     Denial of a Two-Point Reduction Under U.S.S.G. § 3E1.1.

Burns also objects to the PSR's calculation of his offense level because it failed to apply a two-level reduction under U.S.S.G. § 3E1.1(a) for acceptance of responsibility. Citing § 3E1.1, n. 2, Burns contends that the Guidelines contemplate rare situations where "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.* The Application Note further elaborates that one particular situation where such a reduction may apply occurs where "a defendant goes to trial to assert and preserve issues that do not relate to factual guilt." *Id.*

Burns contends that his trial represented that rare circumstance because (1) he never denied his guilt; (2) his decision to go to trial was motivated by a Fourth Amendment issue relating to the search of his computer; (3) he represented himself *pro se* at a time when he was suffering from mental illness; (4) his success in persuading the court to order a *Franks* hearing encouraged him to believe that his counsel was incompetent; and (5) he proceeded to trial, despite the ultimate failure

of his suppression motion, out of fear of the draconian punishment that he faced.  *See* Mem. 4; Supp. Mem. 5-6.

The Government agrees with the PSR's denial of a two-point reduction, arguing that Burns (1) has never admitted guilt and continues to deny responsibility for his conduct; (2) presented a closing argument which asserted that the government had not met its evidentiary burden; (3) has consistently acted in a manner inconsistent with accepting responsibility for his offenses; and (4) continues to minimize his relevant conduct.  *See* Resp. 3-7.

The court is persuaded by the remorse Burns demonstrated at his allocution and elsewhere which shows that he has accepted responsibility for his actions.  The court will accordingly apply the two-point deduction because Burns's decision to go to trial was reasonably motivated by his belief that his civil rights were violated in the search and seizure of his computer.  In the course of prosecuting this colorable constitutional issue, Burns consistently told the truth about the search, while the Evanston police provided important information only late in the process of trial preparation.  The entire course of this case would have been much different (almost certainly ending in a negotiated plea with original counsel) had the Evanston police been more forthcoming from the onset.  Moreover, Burns was acting *pro se* when he made the decision to go to trial, and it appears that he believed – a reasonable belief for a *pro se* defendant – that going to trial was necessary to preserve his Fourth Amendment issue.  Because Burns was attempting to assert and preserve some substantial and difficult issues, because he was acting *pro se*, because he never took the stand and denied his guilt, because in all his dealings with the court since the beginning of this case he has been scrupulously honest, and because the court credits as sincere his expressions of remorse, he is deserving of credit for acceptance of responsibility.

For the reasons stated above, Burns is assigned a base-level of twenty-two under U.S.S.G. § 2G2.2(a)(2), an increase of two under § 2G2.2(b)(2), an increase of two under § 2G2.2(b)(3)(F),[5] an increase of four under § 2G2.2(b)(4), an increase of five under § 2G2.2(b)(5), an increase of two under § 2G2.2(b)(6), an increase of three under § 2G2.2(b)(7)(B), and a decrease of two under § 3E1.1. Accordingly, Burns total offense level under § 2G2.2 is 38, and his advisory Guidelines range is 235-293 months.

### C.    Judicial Criticism of the Child Pornography Guidelines Enhancements

In the wake of *Kimbrough v. United States*, 552 U.S. 85 (2007) and its progeny (*see, e.g.*, *Spears v. United States*, 129 S. Ct. 840 (2009)) numerous district courts have questioned the child pornography Guidelines on policy grounds; these courts have frequently declined to apply these enhancements because they fail to reflect the institutional expertise of the United States Sentencing Commission, are in many cases duplicative and fail to distinguish between aggravated and mine-run cases. *See United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009) (collecting cases); *United States v. Phinney*, No. 08-CR-260, 2009 WL 425816, at *3 (E.D.Wis. Feb. 20, 2009) (collecting cases); *United States v. Aguilar-Huerta*, 576 F.3d 365, 367 (7th Cir. 2009) (recognizing that "a sentencing judge is free . . . to reject a guideline as inconsistent with his own penal theories"); *see generally* Troy Stabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines (July 3, 2008) (*available at*

---

[5]  The PSR and the government both agree to the two-level enhancement for distribution set forth in §2G2.2(b)(3)(F), as opposed to the five-level enhancement found in § 2G2.2(b)(3)(B). The court initially questioned the propriety of this enhancement because it appeared that Burns had traded pornography in online chat rooms and that such conduct constituted "distribution for the receipt or expectation of receipt of a thing of value," and therefore merited a five-level enhancement. § 2G2.2(b)(3)(B). However, the court discussed its concerns about the enhancement with the probation office and was assured that the two-level enhancement was properly applied because Burns never traded images according to a strict *quid pro quo*; rather, Burns and his cohorts volunteered pictures based on vague preferences established in the course of their instant messaging sessions. Because Burns had no strict expectation of receipt of any images, he did not distribute in expectation of receipt of a thing of value and therefore the two-point catch-all distribution enhancement in § 2G2.2(b)(3)(F) properly applies.

http://mow.fd.org/3%20July%202008%20Edit.pdf) (detailing the various congressionally mandated revisions to the child pornography Sentencing Guidelines and their effect on "ordinary" defendants).

The crux of the critique, which this court adopts, bears repeating: a series of amendments to § 2G2.2 by Congress means that an application of the Guidelines to the "average" offender results in a sentence at or close to the statutory maximum, *i.e.*, twenty years. *See, e.g.*, *United States v. Hanson*, 561 F. Supp. 2d 1004, 1011 (E.D. Wis. 2008) (noting that the defendant appeared fairly typical and yet "found himself in a guideline range that exceeded the statutory maximum at the high end"). What produces this result is the nearly universal application of a series of offense-level enhancements related to the number of images (§ 2G2.2(b)(7)(B)), the content of the images (§ 2G2.2(b)(4)), the use of a computer to receive or transmit the images (§ 2G2.2(b)(6)), and the age of the child depicted in the images (§ 2G2.2(b)(2)). These sentencing enhancements are almost always applicable because the Internet is now the primary vehicle for delivering or consuming pornography (legal and illegal) and the number and type of images received is frequently accidental; it is thus a poor indicator of culpability. Most obviously, this means of distribution facilitates the easy collection of a large number of images (triggering the enhancement for quantity). Moreover, because digital collections are generally built through trading images in Internet chat rooms, a defendant generally has very little control over the quantity of images he receives or the content of those images (triggering enhancements for depictions of sadistic sex acts and pictures of children under the age of twelve). The predominance of this illicit bartering also means that most defendants receive another enhancement for distributing images of child pornography. *See* § 2G2.2(b)(3)(F). Given their broad applicability, then, most of the enhancements provided for in § 2G2.2 are of little use in distinguishing between offenders and place most first offenders in the mine run case at or

above the statutory maximum sentence. *See Hanson*, 561 F. Supp. 2d at 1008-09 (rejecting application of nearly every enhancement under § 2G2.2 because the enhancements are applied to nearly every offender and therefore fail to distinguish between more and less culpable conduct). This court joins these district courts in their concern about the application of the U.S.S.G. § 2G2.2 enhancements on policy grounds, and their conclusion that the application of these guideline enhancements does not yield a reasonable sentence in the typical case. *See Spears*, 129 S. Ct. at 842-43 (a court may rejected a guideline on policy grounds even in a "mine run" case).

**D.  Reasoned Alternative Basis for Sentencing**

The authority to reject the Guidelines as a reasonable sentence in a given case does not vest the court with the power to sentence arbitrarily. A court which disagrees with the policy (or lack thereof) supporting a Guideline is required to "devise and follow a different penal theory." *Aguilar-Huerta*, No. 08-2505, slip op. at 2 (citing *Spears*, 129 S. Ct at 843-44). Here, the court declines to disregard the Guidelines entirely and instead adapts them by beginning with the base offense level (as it reflects a statutory minimum) and then rejecting enhancements that the court determines exact punishment that is duplicative of the underlying offense, or do not otherwise effectively serve to distinguish less from more culpable conduct. On the other hand, the court will apply an enhancement or downward adjustment where it finds such an adjustment appropriate based on Burns's relevant individual characteristics or other factors outlined in 18 U.S.C. § 3553(a). *See Beiermann*, 599 F. Supp. 2d at 1107-08 (rejecting the § 2G2.2 Guidelines "categorically" for policy reasons, but adapting them for sentencing purposes based on the factors set out in 18 U.S.C. § 3553(a)).

### E.    Consideration of § 3553(a) Factors

When a defendant represents himself, the court ends up knowing him far better than it typically knows defendants represented by counsel.  When a defendant is represented by counsel, most of what the court knows about the defendant – other than the very limited personal information one gets from the Presentence Report – is what defense counsel wants the court to know.  In Brian Burns's case, however, because the court engaged with him personally over the long course of these protracted proceedings, the court had an opportunity to amass an unusual amount of knowledge about him. In all his dealings with the court, he was unfailingly honest, polite and responsible. Moreover, once the court appointed standby counsel for Burns, he appeared to interact with his standby counsel in a reasonable and responsible way.  That he ultimately decided to request that his standby counsel become his attorney exemplified his approach to these proceedings, which was always respectful and always reasonable.  The court's consideration of the § 3553(a) factors in this case is therefore grounded in a much more extensive course of dealing with the defendant than is typical.

The court begins its survey of the factors set out in § 3553(a) by considering Burns's personal characteristics and history as well as the nature and circumstances of his offense conduct. *See* 18 U.S.C. § 3553(a)(1).

### 1.    Burns's Personal Characteristics and the Nature of His Offense

Dr. Richard Carroll, an associate professor of psychiatry at Northwestern, evaluated Burns and provided an opinion to the court which was included with Burns's sentencing memorandum. Dr. Carroll also testified at the first evidentiary hearing held on August 3, 2009.  In relevant part, Dr. Carroll concluded that (1) Burns suffers from ADHD, bipolar II disorder and various learning

disabilities; (2) his disorders contributed significantly to his use of pornography and his engagement in relationships with adolescent women; (3) his condition is treatable; and (4) that he is at low risk of recidivism. Dr. Carroll's assessment of Burns's propensity for recidivism was based both on an actuarial test he administered to Burns as well as his qualitative professional opinion which he based on his extensive experience treating and evaluating sex offenders. Dr. Carroll opined that Burns has a low potential for recidivism in part because "the experience of being arrested, convicted and incarcerated has had a profound impact on Mr. Burns . . . which will serve as a strong deterrent for any future criminal behavior." Carroll Rep. 14.

A search of Burns's computer by the Department of Homeland Security uncovered ninety still images of child pornography along with two pornographic videos. The possession of any quantity of child pornography is a very serious offense; the five years of mandatory incarceration attending such a violation is proof that such conduct is viewed as reprehensible. However, the court also has the benefit as well as the burden of comparing Burn's wrongful conduct with the misdeeds of other defendants, and by that comparative measure Burns's pornographic hoard is small. *See* Section II.E.4 *infra*. Certainly many of the images Burns possessed were abhorrent, indeed some were horrific, but the *relatively* modest size of Burns's cache, as well as Dr. Carroll's opinion that only a small percentage of these images were of pre-pubescent females,[6] provides the court with two separate insights relevant to Burns's sentencing.

First, Burns is not a pedophile. As Dr. Carroll testified, a pedophile is a person who is predominantly attracted to pre-pubescent men or women. Burns's collection of illegal images, his sexual fantasy questionnaire and even his relationships with adolescent – but *pubescent* – women

---

[6] Dr. Carroll estimated 2%; cross-examination by the government at the sentencing hearing leads the court to conclude that 5% is a more accurate estimate. This issue is discussed below.

confirm that Burns is not sexually attracted to children that have not begun to show outward signs of sexual development. This is an essential distinction because, as Dr. Carroll testified, psychological research has shown that it is *normal* for adult heterosexual men and women to find pubescent minors of the opposite gender sexually attractive. What is not normal, and in many cases actually constitutes criminal behavior, is for adults to act on that attraction and engage in sexual activity with minors younger than a statutorily prescribed age.

Second, Burns's relatively small collection of illegal images suggests that his consumption of child pornography is amenable to psychological treatment. Had Burns been caught with many thousands of images carefully collected over a number of years, the court would have more cause for concern regarding Burns's potential for full rehabilitation. But, to the contrary, the relatively small quantity of images gives the court reason to believe that Burns's consumption of illegal pornography is something that can be corrected with psychological treatment and a period of incarceration. Time in a penal facility will reinforce for Burns the serious harm that his conduct inflicted on the specific children depicted in the pornography he consumed and distributed, as well as on the social fabric of his community.

In its briefs and at two hearings, the government questioned the credibility of Dr. Carroll's opinion. Most relevantly, the government probed (1) the accuracy of Dr. Carroll's assessment that only 2% of the images on Burns's computer were of pre-pubescent children and (2) the reliability of Dr. Carroll's use of the Minnesota Sex-Offender Screening Tool, revised as a basis to conclude that Burns has a low risk of recidivism. Neither attack damaged the validity of Dr. Carroll's opinion in the view of the court.

At the first of two in-court evidentiary hearings, the government reviewed with Dr. Carroll a series of 105 images found on Burns's computer.  Dr. Carroll testified that twenty-three of the 105 images the government showed to him were of pre-pubescent females; Dr. Carroll conceded that this was more than the 2% of the images Dr. Carroll identified as of pre-pubescent females in his report. However, the government did not review the entire cache of five hundred images that Dr. Carroll reviewed in preparing his report; if the 23 images the government showed Dr. Carroll represented all the images of pre-pubescent females, then Dr. Carroll's 2% estimate was incorrect and the total percentage of images of pre-pubescent females was closer to 5%.  Dr. Carroll testified that he could view the images only in thumbnail form on his computer (at trial the government was able to magnify them).  While the government maintains that Dr. Carroll could enlarge the images to the same extent when he reviewed them for the purpose of preparing his report, he testified that he was not able to do so with the technological tools at his disposal.  The court finds that Dr. Carroll's inability to magnify the images sufficiently accounts for the discrepancy between the percentage of pre-pubescent images he identified at the hearing as opposed to in his expert report.[7]  And, more relevantly, the percentage of images of pre-pubescent females is still small, and the discrepancy does nothing to alter Dr. Carroll's view that Burns's primary sexual attraction is to adolescent and young-adult – not pre-pubescent – women, and that such a pattern of attraction is normal in a heterosexual male.

The court also credits Dr. Carroll's finding that Burns is at a low risk of recidivism based on the Minnesota Sex-Offender Screening Tool, revised.  While the government attempted to undermine the general utility of this assessment and Dr. Carroll's specific translation of Burns's

_____

[7]  It is unclear how many of these images Burns himself enlarged.  While he had the technological capacity to enlarge them, what he looked at and for how long was not established.

behavior into the categories listed in the diagnostic questionnaire, Dr. Carroll's responses confirmed for the court that he had filled out the assessment accurately.  Moreover, Dr. Carroll testified that the Minnesota assessment (as opposed to a number of other recidivist screening mechanisms the government recited to him) is the one Dr. Carroll prefers to use because he finds it to be the most thorough and to be based on the most accurate recidivism data.  The government's cross examination of Dr. Carroll did not undermine his opinion in this regard.

Were the consumption of pornography depicting minors Burns's only interaction with pubescent minors, the court might well sentence Burns to the five-year minimum term of incarceration that he requests.  However, Burns's conduct with M, while complicated in a variety of ways that the court will discuss in more detail below, was  serious, inappropriate and unlawful, and must be taken into account in fashioning a reasonable sentence.

### 2.    Burns's Conduct With M

As discussed in section I above, Burns had a sexual relationship with M which began when she was sixteen and Burns was twenty-eight.  Additionally, M testified that Burns touched her inappropriately and without her permission once when she was twelve years old, and that Burns engaged sporadically in Internet conversations which included sexual content beginning when M was thirteen.  Burns additionally sent letters to M in violation of the federal enticement statute after he had been arraigned in Illinois state court for his consensual sexual conduct with M.

Dr. Carroll's report attributes Burns's relationship with M to his immaturity, untreated manic depression, and predilection for compulsive behavior resulting from attention deficit disorder.  While the court broadly agrees with this assessment, Burns's personal demons cannot entirely absolve him of culpability, because it appears to the court that at the time he engaged in this

behavior Burns understood on some level that what he was doing was wrong.

Even though the court believes that justice requires the court to punish Burns for his behavior with M, the court stresses that it does not believe that Burns is a dangerous sexual predator. A review of Burns's correspondence with M confirms that Burns was a very immature twenty-eight year-old when M and Burns dated. That immaturity (which Dr. Carroll noted) coupled with the frankly vulnerable tone of some of Burns's correspondence with M, causes the court to conclude that Burns sincerely loved her. There is nothing inherently abusive about an immature man in his twenties falling in love with a sixteen year-old, who appears to have been sexually active herself and in some ways possibly more mature than he was.[8] Indeed, one of the sadder aspects of this case is M's belief, as to which she appears conflicted but to which she, her mother and her therapist testified with certainty, that Burns did not care for her and was merely using her. Undoubtedly, she has been damaged in many ways, of which this may be the most significant (and so she testified); ensuring that such damage does not occur is one of a number of good justifications for the legal prohibitions on this kind of relationship. Nevertheless, the court is persuaded that Burns sincerely and ardently cared for M.

Genuine affection or care, of course, cannot absolve Burns of the consequences of his actions under our system of law, but it nonetheless represents a foundation upon which Burns may seek to rehabilitate himself. Dr. Carroll, along with dozens of adults and young people who wrote letters to the court on Burns's behalf, have noted Burns's commitment to overcoming obstacles, devotion to hard work and his sense of compassion. Burns, despite significant learning disabilities, psychological problems and family issues, struggled to complete college and ultimately succeeded

---

[8] There was evidence that at some time during their relationship, M used the screen name "Whtetrshgorgeous." It does not appear that this relationship was a simple matter of a mature man manipulating a child.

in doing so; he then attained a master's degree in business while he was on electronic monitoring and awaiting trial in this court. It is the court's sincere hope, and indeed its belief, that Burns can channel these admirable qualities into the challenge of rebuilding his adult life and rehabilitating himself during his incarceration and after his release.

As discussed briefly in Section IIA above, the government argues that these positive personal attributes – the qualities that convinced dozens of individuals to write letters on Burns's behalf – are the very qualities that make Burns dangerous and require the court to sentence Burns to over twenty years of incarceration. In further support of this contention the government points out that M is not the only young woman with whom Burns had a romantic and sexual relationship. Burns admits to having had a relationship with a woman named A which began when she was seventeen and a woman named Kathryn[9] which began when she was sixteen or seventeen and Burns was twenty or twenty-one. All of these relationships, however, were consensual, and the government has put forth no evidence to show that these relationships became sexual before the women turned seventeen, the age of consent in Illinois. Moreover, the email exchange between A and Burns that occurred when A was seventeen and Burns was twenty-six, and that the government contends is unflattering to Burns, does not evince any illegal sexual activity and shows that A and Burns cared for each other very much. A wrote: "Brian Burns you are the sweetest guy I have EVER come across . . . just thinking about you makes me smile." Gov.'s Ex. C. Far from being predatory, Burns and A appear to have been engaged in an relationship based on genuinely mutual affection.

---

[9] The government points out that K's mother stated in a letter to the court in support of Burns that she "believes" that their relationship began in 1999, though Dr. Carroll states in his report that Burns stated that the relationship between he and K (he refers to her as "Kate") began in 1998. The government's records show that K was born in 1982 and therefore was sixteen in 1998 when Dr. Carroll's report says that she and Burns's relationship began. Whether or not the relationship began in 1998 or 1999 is irrelevant because the government has presented no evidence that Burns began a sexual relationship with Kathryn before she turned seventeen.

As for Kathryn and Burns's relationship, Kathryn's mother wrote a letter in support of Burns stating that she completely approved of their seeing each other, and that while he and her daughter were dating, Kathryn's mother "considered [Burns] to be a member of our family and learned to love him like a son." And again, the government has put forth no evidence that Burns had sex with Kathryn before she reached the legal age of consent.

The picture that emerges from these relationships, then, is not of a sexual predator, but of a very immature young man who was able to form emotional connections only with women who were significantly younger in age than he was, but were his as emotional peers. In short, these relationships are further evidence of the accuracy and reliability of Dr. Carroll's professional psychiatric assessment.

### 3. Reasonableness of Sentence in Light of Sentencing Practices in Other Courts

As numerous other district courts have concluded, the various enhancements provided by § 2G2.2 are not helpful in trying to fashion a sentence that adequately accounts for the § 3553(a) factors. As discussed in section II.C, this guideline reflects numerous changes made unilaterally by Congress, without Sentencing Commission, other judicial or expert input, and is not the product of the Sentencing Commission's institutional expertise. These Guidelines are flawed not only because they are duplicative and draconian but most critically because they apply to almost all offenders, allowing no distinction between aggravated and less aggravated behavior. The five-point enhancement under § 2G2.2(b)(5) technically applies because of Burns's relationship with M, but the court has found that Burns's culpability for that conduct is mitigated to some extent by the sincerity of his own feelings for M and the fact that the relationship was not abusive or exploitative as those words are commonly understood. It was abusive and exploitative in the way the offense

of "statutory rape" often is: it has a large potential for harm to the young woman involved and is therefore illegal, but it can exist in circumstances where the guilty party was not abusive and was in love. This is that case. Moreover, the application of a five-point enhancement under § 2G2.2(b)(5) to Burns's conduct underscores that the enhancement is too coarse-grained to be of much use in distinguishing between defendants. Indeed, despite the chasm of culpability that separates the act of sending two love letters with some sexual content to a sixteen year-old with whom the perpetrator believes he is in love and forcibly sodomizing twenty boys, § 2G2.2(b)(5) applies equally to defendants who engage in both acts. *See United States v. Abston*, 304 Fed. Appx. 701, 703 (10th Cir. 2008) (applying five-point enhancement under § 2G2.2(b)(5) for the "forcible sodomy and sexual abuse of twenty male victims, ranging from six to seventeen years of age . . . which occurred from 1999 to 2006"); *see also United States v. McCaffrey*, 437 F.3d 684, 686-87 (7th Cir. 2006) (applying § 2G2.2(b)(5) to defendant who "during his time as a priest . . . had 100 separate sexual contacts with twelve to fourteen minor boys, and . . . hundreds of sexual contacts with perhaps 25 other children at other times in his life"); *United States v. Dunn*, 267 Fed. Appx. 429 (6th Cir. 2008) (applying § 2G2.2(b)(5) where father committed incest with his son). Additionally, as discussed in the Guidelines calculation above, Burns cannot be punished for his consensual sexual conduct with M because sixteen is the age of consent under 18 U.S.C. § 2242(a), one of the statutes incorporated in § 2G2.2(b)(5); he can, however, be punished for sending "enticing" letters to M in interstate commerce under 18 U.S.C. § 2422(b). In short, this enhancement dramatically highlights the general disutility of § 2G2.2: it simply fails to *guide* a court to a just punishment that takes account of the moral blameworthiness of a particular defendant.

Some enhancement under § 2G2.2(b)(3)(F) is nearly always applied to defendants for "distribution" of pornography because most violators trade pornography in order to receive pornography. *See Hanson*, 561 F. Supp. 2d at 1010. Nothing about Burns's "distribution" renders Burns an atypical or particularly culpable defendant. In fact, the method of distribution captured in § 2G2.2(b)(3)(F) and applied in the PSR, is the least offensive (and correspondingly carries the lowest enhancement); it applies in this case because there is no evidence that Burns was a trafficker or even a *quid-pro-quo* trader. In this respect, Burns's conduct places him in the least culpable category of defendants.

As numerous courts have pointed out (discussed above), the two-point enhancement under § 2G2.2(b)(2) for possession of material involving a minor under the age of twelve and the four-point enhancement in § 2G2.2(b)(4), mandating a significant increase in punishment for sadistic or masochistic content, are inherent in this kind of Internet offense; moreover, there is no evidence that Burns sought out such images and these enhancements, if applied, do not reflect any atypical culpability on his part.[10] *See id.* at 1009 (rejecting application of § 2G2.2(b)(4) absent evidence that defendant specifically sought sadistic material).

The court also rejects a two-point enhancement for use of a personal computer because it is typical of the crime. *See id.* Moreover, the court also discards the three-point enhancement for the number of images Burns possessed both because that number is lower than the typical defendant, and because this enhancement resulted from the amendment of the Guidelines in 2003 by Congress

---

[10] The government argues that Burns specifically requested pictures of "young girls" in chat rooms and that this means that he explicitly sought depictions of pre-pubescent children. The court disagrees. While it may be reasonable to infer from such a request that Burns was requesting pictures of minors, in the court's view Burns request is not specific enough to show that Burns intentionally sought out depictions of children.

as a result of the passage of the PROTECT Act and Congress provided no study or rationale supporting this significant enhancement. *Id*. at 1010.

### 4. Calculation of Sentence

Were the court to calculate Burns's total offense level without these enhancements but including a five-point enhancement under § 2G2.2(b)(5) for a pattern of activity involving the sexual abuse or exploitation of a minor, he would be facing a sentencing range of 57-71 months (though subject to a 60-month statutory minimum). His illegal Internet use and his illegal conduct with M were both far less aggravated than many offenses which the law treats as the same. Both were illegal, however, and the court concludes that his sentence should reflect both. He will be sentenced to 72 months in the custody of the Bureau of Prisons.

Section 3553(a) counsels first that the court should consider the nature and characteristics of the offense and the history and characteristics of the defendant. It must consider what sentence is necessary to serve the punishment purposes of sentencing: the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence and to protect the public from further crimes of the defendant. The court should also consider what sentence best provides the defendant with needed training or treatment. All these factors play very significantly in this case.

The five-year mandatory minimum sentence in this case, were that sentence imposed, would be a severe sentence for someone like Brian Burns, who has never before been incarcerated and has essentially lived a crime-free life. Mr. Burns has surmounted significant and disabling psychological and emotional problems to pursue an education and to make a meaningful life for himself. Mr. Burns just received his master's degree and, at the time the case went to trial, was

holding a professional job. Five years' interruption of his life and career, when he is just beginning a career and is at the age when he should be starting to form a family, is not a slap on the wrist. As the volumes of letters received from relatives and acquaintances of Mr. Burns reflect, even this mandatory minimum sentence, applied to a person with no criminal history, is viewed as a serious sentence.

In considering the appropriate length of a sentence, § 3553 counsels that the sentence should be sufficient, but not greater than necessary, to accomplish the listed purposes of sentencing. In this connection, it should be noted that a sentence that is too long, unnecessarily long or in violation of the parsimony provision of § 3553, undercuts the sentencing purposes of § 3553. This judge has been told, in private conversations with personnel from the Bureau of Prisons' sex offender treatment program, that sentences that are too long undercut the ability of the Bureau of Prisons to set up the system of rewards and punishments needed to guide sex offenders capable of rehabilitation toward a better future. Internet child pornography offenders need treatment programs so that they fully understand the damage their crimes have done and the personal reasons why they were susceptible to getting involved in such conduct. But once they have had that treatment, they need to be reintegrated into society so that, under adequate supervision, they can put what they learned to use. One of the tragedies of the child pornography Guidelines, and their promulgation with no study and no debate, is that they fail to reflect considered penal philosophies on dealing with this kind of offender; judges sentencing offenders, making an effort to sentence according to § 3553, cannot rely on these Guidelines to lead them to a just sentence. The Guidelines reflect little other than that Congress was angry. Section 3553 does not permit rage to inform the sentencing process. Brian Burns, because of his remorse, intelligence and the nature of his Internet activities (less

serious than those seen in many other cases) is a strong candidate for a complete rehabilitation. To make that rehabilitation impossible, or at least more difficult than it has to be, by isolating him for longer than serves the purposes of § 3553, is counterproductive, as the parsimony provision of § 3553 makes explicit. Moreover, in dealing with a first offender who is this capable of rehabilitation, giving an unnecessarily harsh sentence would promote disrespect, not respect, for the law.

Throughout the sentencing hearings in this case, the court has learned of psychological factors that have impeded Mr. Burns's progress in many areas and that have contributed to his commission of this offense, both his compulsive Internet voyeurism and his desire for a relationship with a considerably younger woman. These include his depression and low self-esteem, stemming from his difficulties in school, which were clearly exacerbated by the prospect of a lengthy prison sentence and the consequences of this felony conviction, including lifelong registration as a sex offender and a lifelong bar from doing what he most enjoys, coaching, and counseling and working with children. He has suffered with ADHD and a history of isolation from his age cohort, always preferring the company of older and younger people. He was recently, during the pendency of this case, diagnosed for the first time with bipolar disorder. He was never adequately treated as a child, but through this case, has been introduced to medications which hold a great deal of promise for controlling his conditions and helping him to live a normal and fulfilling life. Dr. Carroll has concluded, and the court agrees, that he is not a predator, has never had sex with a child and has a low risk of recidivism. Given that Mr. Burns has always struggled with low self-esteem, and that low self-esteem contributed to his commission of this offense, it is of particular importance, for the

ultimate protection of Mr. Burns and the public, that the sentence not be unnecessarily harsh, that it provide for Mr. Burns' rehabilitation and permit that to occur without undue delay.

The court believes that the sentence it has crafted comports with the overarching command of 18 U.S.C. § 3553(a) to punish parsimoniously. *See Kimbrough*, 128 S.Ct. at 570. The sentence reflects the seriousness of the offense, provides just punishment, adequate deterrence, will protect the public from further crimes and, most importantly given the court's view of Burns's potential for rehabilitation, will provide the defendant with needed mental health and sex offender treatment. A term of 72 months imprisonment on each count (and 3 years of supervised release, the maximum), to be served concurrently, is slightly higher than Mr. Burns' Guideline sentence without the duplicative and inadequately considered enhancements; it is adequate punishment for his Internet offenses and adds an additional year as punishment for the relationship with M, a month longer than the top of the guideline range for the base offense conduct plus the five-point abuse and exploitation enhancement.

The government does not specifically point to any post-*Kimbrough* case where a defendant similarly situated to Burns was sentenced to more time than the court imposed here. Nonetheless, the court is aware that its rejection of the guideline offense level of 38 and the application of a sentence equivalent to a guideline offense level of 25 represents a significant variance from the sentence contemplated by § 2G2.2. Were the court to have adopted the Guidelines in unmodified form Burns would face a sentencing range of 235-293 months, rather than the 72 months the court imposes here.

Even though this variance from the Guidelines sentence is substantial, the sentence the court imposes is reasonable both in view of the grounds the court has already articulated and when viewed

-29-

in light of sentences for violations of 18 U.S.C. § 2552(A)(2)(a) pronounced by other district courts. In *United States v. Shipley*, 560 F. Supp. 2d 739,744-46 (S.D. Iowa 2008), Judge Pratt sentenced the defendant to 90 months after rejecting a Guidelines range of 210-240 months in a case where the defendant had no criminal history but possessed over 600 hundred pornographic images. Judge Adelman also varied from the Guidelines range in *Hanson*, 561 F. Supp. 2d at 1008-12, rejecting a 210-240 month Guidelines sentence of incarceration and imposing a sentence of 72 months. In the District of New Jersey, Judge Hayden sentenced a defendant convicted of receiving over 1500 images and 200 videos to 60 months imprisonment where the Guidelines provided for a range, as they do here, of 235-293 months. *See United States v. Grober*, 595 F. Supp.2d 382 (D.N.J. 2008). Judge Collier of the Eastern District of Tennessee sentenced a defendant who possessed 23 videos and 173 still images to 78 months incarceration after rejecting a Guidelines sentence of 135-168 months. *See United States v. Methane*, 630 F.Supp.2d 886, 897, 903 (E.D. Tenn. 2009). Indeed, the imposition of a non-Guidelines sentence by district courts has become pervasive enough that nearly a third (390 of 1335) of defendants subject to § 2G2.2 guideline who were sentenced between October 1, 2007 and September 30, 2008 received such reduced sentences. *See* United States Sentencing Commission, 2008 Sourcebook of Federal Sentencing Statistics, 79, tbl. 28.

Though Burns did engage in an inappropriate and unlawful relationship with M, which persuades the court to sentence Burns to more incarceration than the statutory minimum of 60 months in order to impose a sentence that fits the seriousness of his offense, he possessed very few illegal images (ninety still images and two videos) relative to other defendants who received a similar sentence of incarceration in the opinions cited above. The court believes this sentence is reasonable, but no longer than necessary, to achieve the purposes of § 3553 and is a just sentence

which avoids "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 U.S.C. § 3553(a)(6).

The 292-month sentence contemplated by the Guidelines and urged by the government is excessive when viewed in relation to the punishment that has been meted out to offenders guilty of acts that were exponentially more damaging to society than the conduct Burns was convicted of here. In *McCaffery* the defendant priest who confessed to molesting hundreds of children over the course of his life received a 240-month sentence. *See McCaffrey*, 437 F.3d at 686-87. In *Beenen,* a defendant who sexually abused a nephew repeatedly during his early-teen and pre-teen years was sentenced to 240 months of incarceration. *See United States v. Beenen*, 305 Fed. Appx. 307, 308-09 (8th Cir. 2008).

A sentence of 72 months is comparable to those given to many defendants who have committed comparable conduct, but the court declines to apply Guidelines which would treat this defendant similarly to such defendants as the defendant in *McCaffrey*, whose conduct was incomparably more aggravated. This sentence achieves the purposes of § 3553(a) in that it is a significant punishment for a first offender and punishes defendant for all of his unlawful conduct, while recognizing that his conduct (both as respects his Internet offense and his conduct with M) was relatively unaggravated and was influenced, if not caused, by psychological problems, some of which had previously been untreated but which can be treated in the future. It recognizes defendant's significant likelihood of complete rehabilitation, after appropriate punishment and treatment. In all these ways, it is sufficient, but not greater than necessary, to achieve the purposes of sentencing as set forth in § 3553(a).

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: October 27, 2009